IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | |
| v. | ) | Case No. 4:15-cr-11 |
| | ) | |
| AARON CULLARS, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' RESPONSE OPPOSING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

Comes now the United States of America, by counsel, and offers its response in opposition to defendant Aaron Cullars's motion for compassionate release (Document 73). The novel coronavirus is spreading broadly among the U.S. population, including among members of the public, health-providers, law-enforcement officers, people who produce and deliver essential products, and those who carry out the functions of the federal, state, and local government. Against that backdrop, Cullars seeks to be released from prison under the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i) as a means to control the spread of the coronavirus within prison. His motion should be denied, as using compassionate release in his case would fail to address a range of important practical and legal problems and would not satisfy the standards in § 3582(c)(1)(A).

## BACKGROUND

From December 2012 to December 2014, Aaron Cullars was both a middleman and an end recipient/distributor for cocaine and cocaine base in the Philadelphia area. The conspiracy of which Aaron Cullars was a part involved two other co-defendants, Hampton-based Marlon Moore and Atlanta-based Lindsey Cullars, Jr.. Aaron Cullars and Moore would pay Lindsey

1

Cullars, Jr. for the drugs with the proceeds from their drug sales. Lindsey Cullars, Jr. then used that money to pay to ship more parcels of cocaine and cocaine base to Aaron Cullars and Moore.

Aaron Cullars joined the drug conspiracy in December 2012, when Moore was in Philadelphia visiting him. At that time, Aaron Cullars, Moore, and Lindsay Cullars, Jr. made arrangements for Moore to purchase cocaine from Lindsay Cullars, Jr. at a price of $1,200 per ounce. Moore's first order, which he placed through Aaron Cullars, was made in December 2012 and was for two ounces of cocaine. Lindsay Cullars, Jr. sent the first few drug parcels to Aaron Cullars in Philadelphia, which Moore would then come to pick up and bring them back to Hampton for distribution.

After Moore picked the first few drug parcels up from Aaron Cullars, Lindsay Cullars, Jr. began sending cocaine and cocaine base directly to Moore in Hampton, though Moore always placed his drug orders with Aaron Cullars, usually by call or text. After Moore's initial two ounce cocaine order, Moore ordered one to four ounces of cocaine per week from Aaron Cullars until the autumn of 2013. From that point until December 2014, Moore ordered about eight to nine ounces of cocaine per week from Aaron Cullars. One time, Moore placed an order for thirteen ounces of cocaine with Aaron Cullars. When Moore would wire payment for the cocaine to Lindsay Cullars, Jr., Aaron Cullars would inform Lindsay Cullars, Jr. that Moore had sent the money.

In addition to serving as a middleman as described above, Aaron Cullars was also obtaining two to four ounces of cocaine from Lindsay Cullars, Jr. per week, which Aaron Cullars would convert to crack cocaine and sell in Philadelphia. During the course of the investigation, the Postal Inspector intercepted three parcels, two of which were bound for Moore and one of which was bound for Aaron Cullars. Those parcels bound for Moore were ordered through

Aaron Cullars. Those parcels contained a total of 105 grams of cocaine and 111.9 grams of crack cocaine. Aaron Cullars regularly remitted drug proceeds to Lindsay Cullars, Jr. to pay for further shipments of cocaine. Aaron Cullars usually did so by depositing cash into Lindsay Cullars, Jr.'s Bank of America account, then later his Wells Fargo account. At times, the co-conspirators used Money Gram, as well.

During the two year period of the conspiracy, Aaron Cullars acted as the middleman for 16 kilograms of cocaine and 111.9 grams of cocaine base. In addition, Aaron Cullars received a total of 5.9 kilograms of cocaine as part of the conspiracy. Altogether, the total cocaine weight attributable to Aaron Cullars was 21.9 kilograms.

On June 16, 2015, Aaron Cullars pled guilty to conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, 28 grams or more of cocaine base, and to use a communication facility, as well as one count of conspiracy to commit money laundering (Document 33). The PSR showed a base offense level of 34 and added two points for possession of a dangerous weapon (Document 44). On November 16, 2015, Aaron Cullars was sentenced to 120 months in prison and five years of supervised release (Document 58). BOP shows a projected release date of September 17, 2023.

**RESPONSE**

**I.       Defendant's request for compassionate release should be evaluated against a practical and legal backdrop.**

The Federal Bureau of Prisons is actively working on the critical problem of containing the spread of the coronavirus within prisons. BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, provided masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under

18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act. This last step carries special importance for this defendant's request for compassionate release.

Before the CARES Act was passed, § 3624(c)(2) provided the "Bureau of Prisons" with the exclusive authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." This provision is in keeping with BOP's authority to designate where an inmate serves a sentence. Congress has now, temporarily, expanded § 3624(c)(2), while leaving its application to BOP. As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting BOP to expand the use home confinement under § 3624(c)(2). Section 12003(b)(2) suspends, during the emergency of the coronavirus pandemic, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, once the Attorney General makes requisite finding that emergency conditions will materially affect the function of BOP.[1] The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement.

Since March 26, 2020, up to now, BOP has placed an additional 1,972 inmates on home confinement (see https://www.bop.gov/coronavirus/index.jsp), focusing on, among other factors, the vulnerability of the inmates, the prisons most at risk, and the dangers posed by the inmates if released. Inmates do not have to apply to be considered for home confinement.

BOP's releases of inmates to home confinement must take into account, among other factors, whether a home is available where the inmate could be confined, whether the inmate

---

[1] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

4

could receive appropriate food and medical care there, the comparative risk to the inmate in home confinement in the identified location versus remaining in prison, the inmate's risk to the public through recidivism, and the availability of supervision during home confinement or risk to the public if supervision is lacking. BOP also seeks to ensure that the inmates it releases to home confinement are not already ill and therefore spreading infection to others—including spreading illness to the individuals who would be needed to make home confinement successful. To help accomplish that goal, BOP is requiring a 14-day period of quarantine before any inmate is released to home confinement. By having BOP control the 14-day period of quarantine—rather than leaving inmates to conduct their own quarantines after release—BOP can ensure the effectiveness of the quarantine and evaluate the appropriateness of any determination that the inmate is not a carrier of the coronavirus.

In addition to these efforts to increase the use of home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act, BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

The current modified operations plan require that all inmates in BOP institutions be secured in their assigned cells/quarters for a period of at least 14 days to stop any spread of the disease. Only limited group gatherings are permitted, with social distancing required to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step also limits transmission.

All staff and inmates have been and will continue to be issued an appropriate face covering and are strongly encouraged to wear the face covering when in public areas when

social distancing cannot be achieved. Every newly admitted inmate is screened for coronavirus risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for the coronavirus or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member showing symptoms can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Rather than relying on BOP to address what both Congress and the Attorney General have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—the defendant envisions a system where hundreds of Courts around the country try to use the tools of litigation to replicate, and potentially override, BOP's efforts.  Critically, under the defendant's approach, Courts must attempt to assess facts that can change within days—if not hours—when many of the changing circumstances could nullify the intended goal of any Court order.

Under the present circumstances, Courts are not well positioned to evaluate a range of quickly changing facts:

- *Safety of place of home detention.* An inmate's proposed residence after release from prison should be a place where no person is infected or soon to be infected.
- *Avoiding recidivism.*  The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12  New arrests not only endanger the public and return an inmate to prison, but also increase the dangers to arresting officers and supervising probation officers.
- *Protecting the public from infection.*  Any release should include measures to assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release;

7

- *Avoiding misallocation of testing resources.* Any request by an inmate should appropriately triage the use of available testing by medical need, not by an unsystematic series of Court orders.

- *Addressing the need for food, housing, medical care, transportation, employment, and other necessities.* Any release order should evaluate whether a released inmate could find—during a pandemic—food, medical care, housing, safe (often interstate) transportation needed to relocate from prison to the inmate's home, and employment during a time when an extraordinarily large number of people are losing their jobs.

- *Evaluating how much of a difference a defendant's proposal would make to disease transmission inside defendant's prison.* Before a defendant receives the benefit of being released from prison, a Court should determine the extent to which releasing a particular inmate makes a difference to disease transmission in one of the 51 BOP facilities and 21 residential reentry centers affected nationwide, *See* https://www.bop.gov/coronavirus/;

- *Assessing how much release would affect the particular inmate's health.* To justify cutting short an inmate's sentence, a defendant's release should make a sufficiently great improvement to the odds of maintaining an inmate's health.

- *Making release decisions fast enough and accurately enough to make a difference.* An inmate's release request requires a Court to determine accurately, with appropriate records, how great a danger the inmate poses to the public and make that determination on a time scale needed to respond to disease transmission within a prison.

- *Appropriately prioritizing supervision resources.* The Probation Office's resources to supervise released inmates are necessarily limited, and any inmate's release should be

assessed against the comparative advantages that another inmate might receive from those same supervisory resources.

To avoid a mass release of inmates that has a serious, negative effect on public welfare, the Court should also take into account the risk to probation officers, police officers, and others who must immediately cope with and supervise released inmates.

This list is not exhaustive and, indeed, could include many additional considerations. The point is that the factors cited above illustrate a general truth—there are no known examples of effectively litigating out of a crisis by taking up thousands of cases simultaneously in hundreds of courtrooms across the country and attempting to have the judicial process evaluate prisoner releases in a pandemic that changes daily and even hourly. A more systematic remedy than individual litigation in Court is needed, and Congress provided a means for arriving at a more systematic response by amending § 3624(c)(2) while the pandemic is ongoing.

BOP has a massively important task ahead of it. Layering the burdens of a huge volume of emergency litigation on top of the difficult challenges that the pandemic has handed BOP is unhelpful. It is also likely to incentivize a counterproductive race to the courthouse in countless cases—a race that will necessarily require this Court to mete out limited re-entry and supervision resources on a first-come-first-serve basis that favors defendants who flout the administrative processes in place to prioritize release for the most vulnerable and least dangerous.

BOP has 141,306 federal inmates in BOP-managed institutions and 10,823 in community-based facilities. There are approximately 36,000 BOP staff. As of May 4, 2020, there are 1,926 federal inmates and 350 BOP staff who have confirmed positive test results for the coronavirus nationwide. Currently, 515 inmates and 148 staff have recovered. There have been 38 federal inmate deaths attributed to the coronavirus.

https://www.bop.gov/coronavirus/index.jsp (updated daily at 3:00 p.m.) (last visited May 4, 2020). Of note, the defendant's prison has zero confirmed cases of coronavirus.

II. **The Defendant Cannot Establish Extraordinary and Compelling Reasons to Warrant a Reduction.**

Release is not appropriate in this case because the defendant cannot establish "extraordinary and compelling reasons to warrant such a reduction" under 3582(C)(1)(A)(i). After all, a § 3582(c)(1)(A) sentencing-reduction motion is not a flexible equitable remedy equivalent to clemency or parole. Instead, Congress has created a narrow statutory framework in which the defendant, the Bureau of Prisons, and the Sentencing Commission all play a relevant part.

To that end, Congress has not itself delineated the universe of "extraordinary and compelling reasons" that could warrant compassionate release. Instead, it has delegated that responsibility to the Sentencing Commission through several statutory provisions. For instance, in 28 U.S.C. § 994(a)(2)(C), Congress directed the Sentencing Commission to adopt policy statements regarding "the appropriate use of . . . the sentence modification provisions set forth in section [] . . . 3582(c) of title 18." Section 994(t) further advised that "[t]he Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). In its instructions to the Sentencing Commission, however, Congress made clear that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Id.

Pursuant to Congress's instructions, the Sentencing Commission adopted a conforming policy statement that creates three requirements for compassionate release under

10

§ 3582(c)(1)(A). U.S.S.G. § 1B1.13. First, a Court must conclude that "[e]xtraordinary and compelling reasons warrant the reduction." Id. § 1B1.13(1)(A).[2] Second, the Court must conclude that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." Id. § 1B1.13(2). Third, the Court must conclude that "[t]he reduction is consistent with this policy statement." Id. § 1B1.13(3).

The Sentencing Commission has also identified four categories of extraordinary and compelling reasons:

(A) Medical Condition of the Defendant;

(B) Age of the Defendant;

(C) Family Circumstances; and

(D) Other Reasons.

U.S.S.G. § 1B1.13, cmt. n.1. Commentary to § 1B1.13, in turn, clarifies that the open-ended provision—labeled "Other Reasons"—only authorizes compassionate release if, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." Id.

Consistent with subdivision (D), the Bureau of Prisons has identified several nonexclusive factors for determining whether "other" extraordinary and compelling reasons exist. These include the defendant's criminal and personal history, the nature of his offense, disciplinary infractions, length of sentence and amount of time served, current age and age at the time of offense and sentencing, release plans, and "[w]hether release would minimize the

---

[2] The statement alternatively provides that absent extraordinary and compelling reasons, a Court may find that a defendant is at least 70 years old and has served at least 30 years on his conviction. See U.S.S.G. § 1B.13(1)(B).

severity of the offense."  BOP Program Statement 5050.50 (Jan. 17, 2019), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  The Program Statement explains that the Bureau of Prisons authorizes compassionate release under § 3582(c)(1)(A) in "particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing."  Id. at 1.

Ultimately, it is the defendant's burden to prove that he is entitled to compassionate release under § 3582(c)(1)(A)(i).  See White v. United States, 378 F. Supp. 3d 784, 785 (W.D. Mo. 2019).  See generally Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise, . . . we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief.").

Courts have properly concluded that a risk of being infected by the coronavirus fails by itself to justify compassionate release.  "[I]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility."  United States v. White, No. 2:07-cr-150, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting United States v. Feiling, No. 3:19-cr-112, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020)).  This is particularly true where, as here, Aaron Cullars is in a prison with no known cases of the coronavirus.  He does not allege otherwise in his motion, rather he only raises the possibility of undetected cases.  That type of speculation is insufficient to warrant relief.

While Aaron Cullars's PSR confirms that he has high blood pressure and polycystic kidney disease, neither of those conditions is among the ones the Centers for Disease Control considers particularly high risk.  People Who Are at Higher Risk for Severe Illness, Centers for

Disease Control and Prevention (May 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (citing those with "*serious* heart conditions" and "chronic kidney disease *undergoing dialysis*") (emphasis added).  The PSR indicated that Aaron Cullars was taking 5mg of Lisinopril per day, but did not indicate whether that was to treat the high blood pressure or the kidney issue.  Confusing matters here is the fact that Lisinopril can be used to treat both high blood pressure and to protect kidneys in those with kidney ailments or who are at high risk for kidney ailments.  Is Lisinopril harmful to the kidneys?, National Kidney Foundation (May 4, 2020), https://www.kidney.org/blog/ask-doctor/lisinopril-harmful-kidneys; Lisinopril (Oral Route), Mayo Clinic (May 4, 2020), https://www.mayoclinic.org/drugs-supplements/lisinopril-oral-route/side-effects/drg-20069129?p=1.  Aaron Cullars does not indicate what sort of treatment he is presently receiving for his health issues, if any.  See United States v. Harper, No. 7:18-cr-25, 2020 WL 2046381, at *2 (W.D.Va. Apr. 28, 2020) (burden is on the party moving for compassionate release to establish eligibility for the extraordinary remedy).

The defendant's motion indicates that he plans on living with his father if his motion is granted.  Unless the defendant's father has moved, at the time of the PSR he was living in the Philadelphia area.  The Court will recall that, at the time of the defendant's arrest, he was living with his parents at a certain address in Philadelphia County.  In stark contrast with the defendant's prison, with zero confirmed coronavirus cases, Philadelphia County has had 13,316 cases of the virus, resulting in 424 deaths.  COVID-19 Data for Pennsylvania, Department of Health (May 4, 2020), https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.  Philadelphia County is a mere 134 square miles, about a quarter of the size of the City of Virginia Beach.  Despite that tiny land area, Philadelphia County alone is not far behind the

13

entire Commonwealth of Virginia on total coronavirus cases and deaths. See <u>COVID-19 in Virginia</u>, Virginia Department of Health (May 4, 2020), http://www.vdh.virginia.gov/coronavirus/ (noting 19,492 cases of the virus and 684 deaths commonwealth-wide). The government cites these statistics because they seriously undercut the presumption underpinning the defendant's motion—that he will surely be safer living with his father in the coronavirus hotspot of Philadelphia County than in a prison with zero cases of the virus.

The defendant also mentions several times in his motion that he is "lowest risk," but the circumstances of his conviction suggest otherwise. The defendant was involved in a multi-state cocaine and crack cocaine trafficking conspiracy, as well as a conspiracy to launder money between Virginia, Pennsylvania, and Georgia. In addition to assuming a middleman role in the drug conspiracy, the defendant engaged in hand-to-hand drug sales around the Philadelphia area. The PSR indicated that the defendant possessed both a MAC-type firearm and a Taurus Judge revolver (Document 44, ¶ 17). Consistent with possession of firearms, the defendant was found in possession of ammunition when he was arrested (Document 34, ¶ 14). For the defendant to suggest that he is "lowest risk" under these facts is a substantial overstatement. While the defendant may not be as high risk as a violent offender, he could not fairly be characterized as low risk, either.

While the defendant offers a more detailed release plan than the undersigned has seen from any other compassionate release movant to date, many of his laudable goals simply cannot be achieved under the present circumstances. For example, though it would be ideal for the defendant to gain employment, the country is experiencing acute job loss at the moment. Indeed, the stay-at-home orders issued in many states, to include Pennsylvania, keep many businesses

closed or operating only at markedly reduced capacity. Those with a criminal history have trouble finding employment even in normal times and the present circumstances compound that difficulty severely. The defendant also seeks to join a gym and a mosque. Again, these are great goals to have, but are not achievable under Pennsylvania's stay-at-home order. <u>Gov. Wolf, Sec. of Health Extend Statewide Stay-at-Home Order Until May 8</u>, Commonwealth of Pennsylvania Office of the Governor (May 4, 2020), https://www.governor.pa.gov/newsroom/gov-wolf-sec-of-health-extend-statewide-stay-at-home-order-until-may-8/. While that stay-at-home order is set to begin phasing out on May 8, 2020 for twenty-four counties, given the staggering number of coronavirus cases in Philadelphia County it is no surprise that Philadelphia is not among those twenty-four counties going to a limited re-opening. <u>Gov. Wolf Announces Reopening of 24 Counties Beginning on May 8</u>, Commonwealth of Pennsylvania Office of the Governor (May 4, 2020), https://www.governor.pa.gov/newsroom/gov-wolf-announces-reopening-of-24-counties-beginning-may-8/.

      The defendant was sentenced for a serious, multi-state drug conspiracy. He possessed weapons and, at his arrest, possessed ammunition. His prison has no known cases of coronavirus, but he seeks release to a county heavily afflicted by the virus. Moreover, many key aspects of his release plan are unachievable under Pennsylvania's stay-at-home order. For all the reasons advanced herein, the government respectfully requests that the Court deny the defendant's motion.[3]

---

[3] If this Court were to disagree with the United States' position above, the government respectfully requests that any order that this Court issues that grants compassionate release require the defendant to undergo a 14-day quarantine that BOP controls before any release.

Respectfully submitted,

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By:    /s/ Kevin Hudson
Kevin Hudson
Assistant United States Attorney
Virginia State Bar No. 81420
Attorney for the United States
721 Lakefront Commons, Suite 300
Newport News, VA 23606
Office Number: (757) 591-4033
Facsimile Number: (757) 591-0866
Email Address: kevin.hudson@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of May 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of the filing (NEF) to all counsel of record. I have also sent a true copy of the foregoing, via first class mail, to the following:

Aaron Cullars
Inmate # 71979-066
FCI Allenwood Low
P.O. Box 1000
White Deer, Pennsylvania 17887

                        By:      /s/ Kevin Hudson
                                 Kevin Hudson
                                 Assistant United States Attorney
                                 Virginia State Bar No. 81420
                                 Attorney for the United States
                                 721 Lakefront Commons, Suite 300
                                 Newport News, VA 23606
                                 Office Number: (757) 591-4033
                                 Facsimile Number: (757) 591-0866
                                 Email Address: kevin.hudson@usdoj.gov